Filed 12/23/24  P. v. Vasquez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THOMAS MARTIN VASQUEZ,<br><br>Defendant and Appellant. | F086593<br><br>(Super. Ct. No. BF119852D)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  Elizabet Rodriguez, Judge.

William Howard Safford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

During an extraordinarily violent crime spree with confederates, defendant Thomas Martin Vasquez murdered and robbed one man and attempted to rob another man and a boy.  He was sentenced to life without the possibility of parole plus 25 years to

life.  Following the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), Vasquez petitioned the trial court for resentencing, contending he could no longer be convicted of murder because of the bill's modifications to liability for murder. The trial court denied the petition at the prima facie stage, finding that Vasquez was ineligible for relief as a matter of law.  Vasquez appeals from that decision.  Because the record shows he is ineligible for the relief he seeks as a matter of law, we affirm the trial court's order denying the petition for resentencing.

## BACKGROUND

### I.      The underlying crimes and procedural history

The following facts of the underlying crimes are taken from the appellate opinion in Vasquez's prior appeal.  (*People v. Vasquez* (Jun. 29, 2011, F059577) [nonpub. opn.], 2011 WL 2557496.)

Vasquez and five friends were drinking beer and setting off Fourth-of-July fireworks in front of their apartments on Eye Street between Second and Third Streets in Bakersfield on the night of July 4, 2007.  The men in the group were Vasquez, Gregory Aguilar, and Mike Aguirre.  Also present were Vasquez's girlfriend Yesenia Hernandez, her friend Venessa Alexander, and Ivan Gomez, who was the 14-year-old brother of Aguilar and Hernandez.  The siblings, Aguilar and Hernandez, were known as "Menace" and "Nasty."

Aguirre said, "[L]et's go beat someone up."  He also wanted to commit robberies. The others did not want to do so at first, but Aguirre persisted, repeating the suggestion several times.  Vasquez finally agreed.  Vasquez was especially interested in injuring someone, while Aguirre focused particularly on stealing.  "[L]et's go fuck somebody up, I'm gonna show you how to fight," said Vasquez; while Aguirre said, "[A]ll right, I'm gonna get the money."  Aguilar also agreed.

At about midnight, the six of them assembled to carry out this plan and proceeded together down Eye Street on foot.  At the corner of Third and Eye Streets, the group

2.

encountered Everett Curtis and his 14-year-old son, Anthony Lopez. Curtis and Lopez had just walked from their apartment to the A-1 Market nearby. The market was closed and Curtis and Lopez were walking back home. Vasquez approached Curtis and said, "[W]here's my 40 at?" This apparently meant Vasquez wanted to be given a 40-ounce bottle of beer. Aguirre said, "[W]hat do you got for me," and Vasquez said, "[G]ive me your money." Curtis said, "I don't know you and I don't owe you anything," and said he had no money. Vasquez and the other men attacked Curtis. Aguirre knocked him down. Vasquez kicked Curtis and stomped on his back and head several times. Curtis lost consciousness. Nothing was taken from him.

Lopez told the men to stop attacking Curtis, so Aguilar and Aguirre attacked Lopez. Aguirre hit him in the face and knocked him down, and then the two of them kicked him in the ribs. The attackers ran away when a resident of a house at the corner of Third and Eye Streets, who witnessed the beatings, yelled to her friends to call the police.

The group reassembled in front of their apartments down the block and drank some more. A police car soon passed by and Aguirre yelled something at it. While an officer got out and searched Aguirre, Vasquez and Hernandez ran off and Aguilar went inside. Hernandez called Aguilar on the phone. She told him to climb out the bathroom window and find a gun, a chrome snub-nose pistol, in the bushes outside a neighboring apartment. Aguilar did as his sister told him, and then met her and Vasquez a block away. They walked back to the apartments and Aguilar gave Hernandez the gun.

They stayed on the porch of Aguilar's apartment, drinking some more. After a while, Hernandez started throwing beer cans at cars and Aguirre advocated going out to attack another person. "[L]et's go fuck somebody else up," he said. Vasquez eventually agreed, saying, "[F]uck it, let's go." At some point during the interlude between attacks, Hernandez cut the hood off her sweater and cut two holes in it to make a mask, which she gave to Vasquez. Vasquez was wearing a rosary.

Vasquez, Aguirre, and Aguilar walked off at about 2:00 a.m. to buy more beer. All agreed that if they encountered anyone on the way, they would "fuck 'em up."

David Timberlake and Tiffany Guiles were in an alley near the intersection of H and Third Streets. They had been told there was no room for them at a Fourth-of-July party in an abandoned apartment and they had gone behind the building to inject methamphetamine. They were walking in the alley afterward when Vasquez, Aguirre, and Aguilar spotted them. Aguirre yelled "there it is," and the three of them ran toward Timberlake and Guiles. Timberlake fled.

Aguilar recognized Guiles, who was an acquaintance of his and Aguirre's, and called the others back. Aguirre hugged Guiles and Timberlake returned. Aguirre and Vasquez taunted Timberlake about running away, suggesting that he had exposed Guiles to danger. Aguirre told Guiles to slap Timberlake; Guiles complied. Vasquez called Timberlake "a bitch or something."

Vasquez started fighting with Timberlake. Vasquez was faring poorly, so Aguilar entered the fight on Vasquez's side. Aguirre joined in as Guiles ran away. Aguirre knocked Timberlake down and Timberlake curled up into a ball on the ground. He screamed and yelled for help as the three attackers kicked and punched him. Eventually Timberlake lost consciousness and rolled onto his back, but the three men continued kicking him. Aguilar got scared because Timberlake "was bleeding real bad in his nose and he was breathing weird." Aguirre wanted to stop, but Vasquez said, "fuck that, let's kill him," and continued kicking Timberlake's head. Aguirre joined in again, but Aguilar said it was enough. Finally, they stopped and walked back toward their apartment building. Aguilar and Aguirre stopped to talk to Guiles, whom they found smoking a cigarette on a porch in the alley. Vasquez continued on to the apartments. Aguirre and Aguilar went to Aguirre's apartment to play video games.

Guiles did not call the police. She identified Vasquez, Aguilar, and Aguirre as the attackers in an interview with a detective, but claimed at trial that she was unable to

4.

identify the attackers. Guiles, who was in custody at the time of trial for a failure to appear as a witness at a hearing in the case, was transported to court from Lerdo on the same bus as Vasquez. She claimed he said that if she testified against him, she would "catch a bullet in [her] teeth."

After Aguilar and Aguirre had been playing video games for a while, Vasquez and Hernandez arrived at Aguirre's apartment. Vasquez had blood on his shoes and Hernandez had a wallet. Vasquez said he had gone back and kicked Timberlake some more and Hernandez said she robbed him. In the wallet was a picture of Timberlake with a woman and two children.

At 2:31 a.m., Gillian Moreno, who lived in an apartment on Third Street near H, called 911. She reported that she had found a man badly beaten in the alley. She said he was "beat up really bad by his head. Like almost dying …." He was unconscious and "almost gone. His feet are like twitching and he's, I mean he don't sound good at all." She told the dispatcher that at one point during the call, he stopped breathing, but then started breathing again. "[S]o hurry up and get here," she said. Later, at trial, Moreno said she was acquainted with Timberlake and had seen him earlier that day, but he was so badly beaten when she found him in the alley that she did not recognize him. The dispatcher told her to wait there. No responder was dispatched, however, until 2:57 a.m.

Meanwhile, Vasquez, Hernandez, and Aguilar sat for a while in Aguirre's yard, and then Vasquez said, "Fuck this, I'm gonna kill him." He and Hernandez left the yard. Aguilar followed them.

The three of them reached the place where Timberlake lay on the ground. Moreno, still in the alley waiting for the police, saw them approach. Vasquez said "God forgive me" and put on the mask Hernandez had made. Moreno, seeing Vasquez holding the gun while he put on the mask, ran into the apartment and watched from the window. Vasquez fired five shots. Vasquez, Hernandez, and Aguilar ran back to their apartments.

5.

Police officers who were dispatched at 2:57 a.m. in response to Moreno's 2:31 a.m. call finally arrived in the alley at 3:06 a.m. Timberlake was dead, having been shot three times in the head, once in the chest, and once in the neck. He also had many blunt-force trauma injuries consistent with having been kicked and beaten. A broken set of rosary beads was found on the ground near the body.

The district attorney filed an information against Vasquez and Aguilar. Count 1 charged Vasquez and Aguilar with the premeditated murder of Timberlake. (Pen. Code, § 187, subd. (a).[1]) Count 1 also alleged that the murder occurred during the commission of a robbery (§ 190.2, subd. (a)(17)(A)); that Vasquez personally discharged a firearm causing death (§ 12022.53, subd. (d)); and that Aguilar was vicariously armed with a firearm (§ 12022, subd. (a)(1)). Count 2 charged both defendants with robbery of Timberlake (§ 212.5, subd. (c)); it also alleged that Vasquez personally discharged a firearm causing death (§ 12022.53, subd. (d)); and that Aguilar was vicariously armed with a firearm (§ 12022, subd. (a)(1)). Counts 3 and 4 charged both defendants with attempted robbery of Curtis and Lopez. (§§ 212.5, subd. (c), 664.) Count 5 charged Vasquez alone with being a felon in possession of a firearm. (§ 12021, subd. (a)(1).) Aguilar entered into a plea agreement, accepting a 12-year prison term in exchange for his testimony against Vasquez.

Vasquez went to trial. The jury found him guilty as charged and found true the robbery-murder special circumstance and the enhancement allegations.

The court sentenced Vasquez to life without the possibility of parole for count 1, premeditated murder with a robbery special circumstance, plus a consecutive term of 25 years to life for the firearm enhancement. It imposed the upper term of five years for count 2 and stayed it pursuant to section 654; and it imposed concurrent terms of three years each for counts 3, 4, and 5.

---

[1] Undesignated statutory references are to the Penal Code.

## II.     Section 1172.6 proceedings

We affirmed Vasquez's judgment in 2011.  (*People v. Vasquez, supra,* F059577.)
In December 2021, Vasquez petitioned for resentencing under former section 1170.95
(now section 1172.6),[2] alleging that (1) the information in his case allowed the
prosecution to proceed on a theory of felony murder or murder under the natural and
probable consequences doctrine, (2) he was convicted of murder after a trial, and (3) he
could not now be convicted of murder because of changes to section 189 made effective
January 1, 2019.  (§ 1172.6, subd. (a)(1)–(3).)

The trial court held a hearing to determine Vasquez's eligibility for resentencing
and concluded that he failed to establish a prima facie case for relief.  The court
explained that the jury's true findings on the firearm use enhancement allegation
(§ 12022.53, subd. (d)) and the robbery-murder special circumstance (§ 190.2,
subd. (a)(17)(A)) show that the jury convicted Vasquez of murder as the actual killer.  To
that point, the court found that Vasquez had failed to meet section 1172.6,
subdivision (a)(3), as actual killers are ineligible for section 1172.6 relief.  In making this
finding, the court cited sections 1172.6, subdivision (a)(3); 188, subdivision (a)(3); and
189, subdivision (e)(1).[3]  Vasquez timely appealed.

---

[2] Effective June 30, 2022, former section 1170.95 was renumbered section 1172.6
without relevant change.  (Stats. 2022, ch. 58, § 10.)  We will cite to the current
section 1172.6 throughout this opinion.

[3] Section 188, subdivision (a)(3), provides:  "Except as stated in subdivision (e) of
Section 189, in order to be convicted of murder, a principal in a crime shall act with
malice aforethought.  Malice shall not be imputed to a person based solely on his or her
participation in a crime."

Section 189, subdivision (e)(1), provides, in relevant part, that a participant in a
robbery-murder is liable for murder if they were the actual killer.

7.

## DISCUSSION

**I.     Vasquez's ineligibility for relief as a matter of law**

Vasquez's first contention is that the trial court erred in denying his section 1172.6 petition at the prima facie stage.  He argues the record of conviction does not show he is ineligible for relief as a matter of law.  We disagree.

Senate Bill 1437 was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Stats. 2018, ch. 1015, § 1(f).)

In addition, Senate Bill 1437 created a mechanism for individuals convicted of qualifying offenses to petition for resentencing.  Section 1172.6 permits individuals who were "convicted of felony murder or murder under the natural and probable consequences doctrine … [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder … conviction vacated and to be resentenced on any remaining counts" when three conditions apply.  (§ 1172.6, subd. (a).)  One of those conditions is that the "petitioner could not presently be convicted of murder" after the amendments enacted by Senate Bill 1437.  (*Id.*, subd. (a)(3).)  Once a complying petition is filed, the court appoints counsel if requested, the parties submit briefs, and the trial court makes a prima facie determination of eligibility.  (*People v. Lewis* (2021) 11 Cal.5th 952, 966.)  The prima facie inquiry is "limited," and courts must " ' "take[ ] petitioner's factual allegations as true." ' "  (*Id.* at p. 971.)  " 'However, if the record [of conviction], including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' "  (*Ibid.*)  This is a pure question of law we review de novo.  (*People v. Lopez* (2022) 78 Cal.App.5th 1, 14.)

Here, a review of the jury instructions and verdicts show Vasquez is ineligible for relief as a matter of law. As to the robbery-murder special circumstance, the jury was instructed with CALCRIM No. 702. As modified by the trial court, that instruction stated:

> "If you decide that the defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance of murder committed during the commission of a robbery, you must also decide whether the defendant acted with the intent to kill.
>
> "In order to prove this special circumstance for a defendant who is not the actual killer but who is guilty of first degree murder as an aider or abettor or a member of a conspiracy, the People must prove that the defendant acted with the intent to kill.
>
> "The People do not have to prove that the actual killer acted with the intent to kill in order for this special circumstance to be true. If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find this special circumstance true, you must find that the defendant acted with the intent to kill.
>
> "If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he acted with the intent to kill for said special circumstance to be true. If the People have not met this burden, you must find this special circumstance has not been proved true."

Therefore, to find the robbery-murder special circumstance true, the jury had to find that Vasquez was the actual killer or aided and abetted the murder with the intent to kill. In either case, Vasquez would still be guilty or murder even after the changes enacted by Senate Bill 1437. He is therefore ineligible for resentencing as a matter of law.

Vasquez contends the special circumstance finding does not necessarily prove that the jury found he was the actual killer. He argues:

> "The jury might have concluded that, when Mr. Vasquez *shot* Mr. Timberlake, he 'acted with the intent to kill.' [¶] However, according to the factual narrative the District Attorney relied upon, taken from this Court's brief summary in the prior appellate opinion, the robbery occurred

9.

during the second encounter, and there seems little doubt that Mr. Vasquez and Ms. Hernandez reached 'a place of temporary safety.' Thus, the jury might have found the special circumstance allegation true based on the belief that the death occurred during the course of the robbery, without necessarily concluding that Mr. Vasquez intended to kill *during that robbery*, because they relied on the vague and permissive nature of the instruction as authorizing them to use his later-formed intent to kill."

Vasquez is incorrect that the special circumstance instruction is "vague" and permitted the jury to find the special circumstance allegation true based on the belief that Vasquez shot Timberlake with the intent to kill *after* the robbery-murder was completed. The first paragraph of the robbery-murder special circumstance instruction clearly ties the intent to kill to the commission of the robbery-murder. The phrase "murder committed during the commission of a robbery" establishes a temporal and contextual nexus between the robbery and the murder. And the jury would understand that the intent to kill must relate to this combined criminal act, not to a later, unrelated action. Vasquez improperly isolates the "acted with the intent to kill" language from the broader context of the instruction. When read as a whole, the instruction is clear that the intent to kill must be part of the robbery-murder's commission.

## II. Right to be present

Vasquez requested appointment of counsel in his section 1172.6 petition, and the trial court accordingly appointed him counsel. But Vasquez was not present at the hearing to determine whether he had made a prima facie case for relief, nor was he present at any of the 10 prior hearings concerning his petition. He contends he had a federal constitutional right and a statutory right to be present at the prima facie hearing, and he contends he was prejudiced by the deprivation of these rights. He also asserts the record shows he never waived his right to be present.[4]

---

[4] At most of the hearings on the petition, Vasquez's appointed counsel stated they were appearing for him under section 977. Section 977, subdivision (b)(1), requires felony defendants to be present at all proceedings unless they waive their right to be present, with leave of court and with approval by defendant's counsel.

We need not decide whether Vasquez had a right to be present at the prima facie hearing because in any event he was not prejudiced. When a defendant's federal constitutional right to be present at a hearing is implicated, the deprivation of this right is assessed for prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Basler* (2022) 80 Cal.App.5th 46, 59 (*Basler*).) Under the *Chapman* standard, "we ask whether [the defendant's] absence was harmless beyond a reasonable doubt." (*Basler*, at p. 59.) Vasquez's absence was harmless under any prejudice standard because the record of conviction shows he is ineligible for section 1172.6 relief as a matter of law. There is no way his presence or absence at the hearing affected the outcome.

## DISPOSITION

The trial court's July 14, 2023, order denying the petition for resentencing is affirmed.

SNAUFFER, J.

WE CONCUR:

DETJEN, Acting P. J.

DESANTOS, J.

11.